## Charles M. Scott & another[1] *vs.* Stuart T. Garfield & another.[2]

Essex. April 9, 2009. - September 15, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Landlord and Tenant,* Habitability. *Negligence,* Comparative, Spoliation of evidence. *Damages,* Breach of implied warranty of habitability. *Evidence,* Medical expenses. *Practice, Civil,* Preservation of evidence.

This court concluded that a lawful visitor on leased property may recover for personal injuries caused by a breach of the implied warranty of habitability [793-796]; therefore, in a civil action brought by a plaintiff seeking damages for personal injuries, the trial court judge properly denied motions filed by the defendant landlord for a directed verdict and for judgment notwithstanding the verdict, where the jury reasonably could have found that the plaintiff suffered injuries caused by the failure of a porch railing that did not comply with the minimum standards required by the State building and sanitary codes, in breach of the implied warranty of habitability [796]; further, the judge did not err in declining to instruct the jury that they were required to find, as a threshold question, whether the defendants had notice of the condition of the railing [796]; nor did the judge err in declining to instruct the jury that they were required find that the porch was vital to the use of the demised premises [797].

In a civil action brought by a plaintiff visitor seeking damages for personal injuries caused by a breach of an implied warranty of habitability (i.e., the failure of a porch railing), the trial court judge neither erred in finding that the loss of certain evidence by the defendants constituted spoliation nor abused his discretion in imposing sanctions therefor, where there was no dispute that the defendant, as landlord, controlled the evidence after the accident and, at the time when the evidence was discarded, knew it was likely to be involved in litigation and should have appreciated its possible importance as evidence such that he had a duty to preserve it. [797-800]

In a personal injury action, a trial court judge properly denied a motion in limine filed by the defendants that sought to limit the jury's consideration of the plaintiff's medical bills to the amounts actually paid to his health care providers, rather than the amounts billed by those health care providers, and properly allowed in evidence the plaintiff's medical bills with the amounts paid having been redacted, where G. L. c. 233, § 79G, provides that medical bills shall be admissible as evidence of the fair and reasonable charges for medical services; where the "collateral source rule" prohibited

[1]Pamela Scott.
[2]Ellen M. Garfield.

the defendant from showing that the plaintiff received compensation for his injury from some other source; and where the defendants made no evidentiary proffer as a foundation for a challenge to application of the collateral source rule. [800-801] CORDY, J., concurring, with whom BOTSFORD, J., joined.

In a personal injury action, the trial court judge did not err in instructing the jury that if certain medical expenses of the plaintiff were paid by a third party such as a health insurer, the insurer could seek reimbursement from any judgment awarded to the plaintiff, where the instruction correctly stated the law under the medical lien statute, G. L. c. 111, § 70A, and was remedial in nature. [801-802]

CIVIL ACTION commenced in the Superior Court Department on February 19, 2004.

The case was tried before *Thomas R. Murtagh*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul J. Gillespie* (*Kristen L. Morgan* with him) for the defendants.

*Thomas H. Hayman* (*Francis R. Powell* with him) for the plaintiffs.

IRELAND, J. We transferred this case from the Appeals Court to consider whether a lawful visitor may recover damages for personal injuries caused by a breach of the implied warranty of habitability. Charles M. Scott (Scott) suffered injuries while visiting an apartment leased by his friend from the defendants, Stuart and Ellen Garfield, when a railing on a second-floor porch gave way and he fell to the ground. Judgment entered for Scott on his claim of breach of the implied warranty of habitability, and the defendants appealed. Because we conclude that a lawful visitor may recover damages for personal injuries caused by a breach of the implied warranty of habitability, that the judge neither erred in finding that the loss of evidence by the defendants constituted spoliation nor abused his discretion in imposing sanctions therefor, and that the judge did not abuse his discretion in excluding from evidence the amounts of money paid by Scott's health insurer toward his medical bills, we affirm the judgment.

1. *Background.* We present the essential background and facts, reserving some details for our discussion of the issues raised.

In 1992, the defendants bought a three-story house in Lynn. The defendants resided on the first floor. In 1993, they let the second-floor apartment, which included a porch,[3] to the plaintiffs' friend, Sherry Baker.[4] Before the defendants leased the second-floor apartment to Baker, the department of public health of Lynn inspected it and issued a certificate of occupancy. The defendant Stuart Garfield was present on the second-floor porch on several occasions after 1993. He was a social guest of Baker at times, and he also had access to the porch annually in order to clean the gutters. In 1996, after being informed that a section of railing on one side of the porch was loose, Garfield repaired it. He made no repairs to the section of railing at the other side of the porch. In 2000, Garfield told Baker that he planned to repair the porches on the house, including the second-floor front porch. No repairs were made, however, before the date when Scott was injured. In 2002, Baker gave notice that she intended to terminate her lease and move out.

On July 20, 2002, the plaintiffs planned to help Baker pack for her upcoming move. Earlier in the day, Scott had consumed a glass of wine with lunch at his home. He and his wife then went to Baker's apartment, where several other people were helping. Scott drank a beer while socializing with some of the other guests, and opened another beer when he began to help pack. He took a rug onto the porch to shake it out, and leaned over the section of railing on the other side of the porch from where Garfield had made a repair in 1996. As he stood up, the railing gave way and Scott fell to the ground, seriously injuring his shoulder.

An attorney who represented Scott made a telephone call to Garfield eleven days after the accident and sought to have him preserve the railing. Garfield did so. The attorney did not, however, ask Garfield to preserve the columns on the porch to which the railing had been attached. During the following month,

---

[3]The porch was located at the front of the house, directly above the first-floor porch, and was covered by a roof, which was held up by three columns. There were two sections of wooden railing, consisting of a top rail and a bottom rail, between which stood balusters. The sections of railing were attached to the columns at the far ends of the porch, and to either side of the column at the center of the porch.

[4]Baker initially had a cotenant, who moved out in 1998.

Garfield had a contractor, who had been performing work elsewhere at the house, perform repair work on the second-floor porch. The contractor removed the two columns to which the railing had been attached and discarded them.

The plaintiffs commenced an action in the Superior Court, asserting claims for negligence and breach of the implied warranty of habitability, as well as a separate claim by Pamela Scott for loss of consortium.[5] The defendants raised as a defense that, due to his alcohol consumption, Scott had been comparatively negligent. The case was tried to a jury.

The jury returned special verdicts in favor of Scott, on his claims of negligence and breach of the implied warranty of habitability, in favor of Pamela Scott, on her claim for loss of consortium, and in favor of the Garfields on their comparative negligence defense, finding that Scott had been twenty per cent comparatively negligent. Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974). Because judgment entered for Scott on his claim of breach of the implied warranty of habitability (rather than his claim for negligence), he recovered $450,000, the full amount of damages found by the jury with no reduction for the jury's finding of comparative negligence. Pamela Scott recovered damages in the amount of $4,000 on her loss of consortium claim. The defendants appealed, and we transferred the case to this court on our own motion.

2. *Discussion.* a. *Implied warranty of habitability.* The defendants moved for a directed verdict, Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974), and for judgment notwithstanding the verdict, or in the alternative for a new trial, Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), on the breach of implied warranty of habitability claim, on the ground that Scott was a guest rather than a tenant and therefore could not recover under the implied warranty of habitability. The judge denied the motions.[6] The defendants contend that the judge erred in denying their

---

[5] The plaintiffs also asserted a claim against the defendants pursuant to G. L. c. 93A, § 9. The docket indicates that the judge dismissed this claim because the defendants were owner-occupants of the three-family dwelling and were therefore not subject to G. L. c. 93A.

[6] The judge also denied a motion by the plaintiffs to set aside the jury's finding of comparative negligence.

motions because our case law has not recognized the right of a guest of a tenant to recover under the warranty. For the reasons that we now set forth, we conclude that a lawful visitor may recover for personal injuries caused by a breach of the implied warranty of habitability.

The implied warranty of habitability, as it has developed in our decisions, is a multi-faceted legal concept that encompasses contract and tort principles, as well as the State building and sanitary codes. Although the warranty itself arises from the residential leasing contract between landlord and tenant, we have imposed a legal duty on the landlord, in the form of an implied agreement, to ensure that the dwelling complies with the State building and sanitary codes throughout the term of the lease. See *Crowell* v. *McCaffrey*, 377 Mass. 443, 451 (1979). See also *Doe* v. *New Bedford Hous. Auth.*, 417 Mass. 273, 281 (1994) (minimum standards of warranty of habitability measured by applicable State building and sanitary codes); *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184, 199 (1973) ("This warranty [insofar as it is based on the State Sanitary Code and local health regulations] cannot be waived by any provision in the lease or rental agreement"). To the extent that a residential lease is a contract between landlord and tenant, there is no question that only a tenant (and not a guest) can recover for economic loss caused by a breach of the implied warranty of habitability. See, e.g., *Cruz Mgt. Co.* v. *Thomas*, 417 Mass. 782, 787 (1994).

The warranty also sounds in tort, and we have recognized that a tenant may recover damages for personal injuries caused by a breach. See *Crowell* v. *McCaffrey, supra* (implied warranty of habitability "carries with it liability for personal injuries caused by a breach"). Cf. *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353 (1983) (recognizing product liability claims for personal injuries based on breach of warranty sound essentially in tort).

Our conclusion that lawful visitors, like tenants, may recover for personal injuries caused by breach of the implied warranty of habitability rests, in part, on the expectation that a tenant might invite a guest into his home, and the concomitant expectation that the tenant's home must be safe for a guest to visit — which together go to the very heart of the landlord's contractual

obligation to deliver and maintain habitable premises that comply with the building and sanitary codes. Our conclusion is consistent with the State sanitary code itself, which provides that the purposes of the minimum standards of fitness for human habitation are to "protect the health, safety and well-being of *the occupants of housing and of the general public*" (emphasis added). 105 Code Mass. Regs. § 410.001 (1997). A lawful visitor of an "occupant of housing" plainly comes within the scope of persons intended to be protected and therefore also within the ambit of the implied warranty of habitability while on the rented premises.

Moreover, we have long since eliminated much of the legal significance attached to the question of status in our tort law. See *Mounsey* v. *Ellard*, 363 Mass. 693 (1973) (doing away with distinctions between categories of licensee and invitee and holding that landowner owes duty of reasonable care to all lawful visitors). A tenant's guest may recover damages from a landlord for personal injuries caused by negligent maintenance of the premises rented to the tenant. See *Young* v. *Garwacki*, 380 Mass. 162, 168 (1980). Logic, therefore, compels our conclusion that a lawful visitor may also recover for personal injuries caused by a breach of the warranty of habitability. To decide otherwise would create or maintain a type of distinction based on status that we long ago rejected. It would not stand to reason that where a tenant and a lawful visitor both suffered injuries on the tenant's rented premises, caused by the same significant defect in violation of the sanitary code, the tenant might recover on a breach of warranty claim, while the tenant's guest could recover only in negligence, thus subjecting only the guest to a comparative negligence defense. See *Correia* v. *Firestone Tire & Rubber Co.*, *supra* (comparative negligence statute, G. L. c. 231, § 85, not applicable to breach of warranty claim).[7]

Our holding also accords with the Restatement (Second) of

[7]We recognize that the inapplicability of comparative negligence as a defense to a breach of warranty of habitability claim may not relieve a tenant or a lawful visitor of his or her legal responsibility to act reasonably toward a defect on the premises. Cf. *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 356 (1983) (consumer's own negligence does not prevent recovery except where consumer unreasonably uses product that he knows to be defective and dangerous).

Property (Landlord and Tenant) § 17.6 (1977), insofar as it provides:

> "A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession . . . and the existence of the condition is in violation of: (1) an implied warranty of habitability; or (2) a duty created by statute or administrative regulation."

Turning to the issues in this case, there was no error in the denial of the defendants' motions for a directed verdict and for judgment notwithstanding the verdict. Based on the evidence, the jury reasonably could have found that the condition of the porch railing did not comply with the minimum standards required by the building and sanitary codes, in breach of the implied warranty of habitability, and that Scott suffered injuries as a result when the defective railing gave way.

The defendants also argue that the judge erred in failing to instruct the jury that they must find, as a threshold question, that the defendants had notice of the defect or violation giving rise to the breach of the implied warranty of habitability.[8] We need not decide whether notice is necessary with respect to the implied warranty, see note 8, *supra*, because the jury returned special verdicts in favor of Scott on both his negligence and breach of warranty claims. The jury's finding of negligence, which we conclude was fully supported by the evidence, indicates that the jury found the defendants had notice of the defective railing and failed to exercise reasonable care to repair it.[9]

---

[8]Where a tenant seeks to recover for economic loss under the warranty of habitability, we have held that the applicable standard is one of strict liability, rather than one of negligence (which would require that the landlord had notice of the defect). See *Berman & Sons* v. *Jefferson*, 379 Mass. 196, 198-204 (1979). We have left open the question whether, where a tenant (or, as here, a lawful visitor) seeks to recover for physical injuries caused by a breach of the warranty, the standard is one of negligence, as provided by the Restatement (Second) of Property (Landlord and Tenant) § 17.6 (1977) (requiring that landlord have notice of defect or code violation during the term of the lease), or strict liability. We need not decide the question today, because, as discussed *infra*, it does not affect the disposition of this case.

[9]We have previously noted with approval the practice of charging the jury

The defendants further contend that the judge erred in failing to instruct the jury that they must find, as a threshold matter, that the porch was vital to the use of the demised premises in order to conclude that there was a breach of the implied warranty of habitability. This argument is unavailing where our decision in *Crowell* v. *McCaffrey*, 377 Mass. 443, 451 (1979), stated that the implied agreement by a landlord to ensure that a rented unit complies with minimum standards prescribed by building and sanitary codes extends to a porch that is part of a rented unit.

b. *Spoliation of evidence.* Before the close of evidence in the plaintiffs' case, the judge held an evidentiary hearing outside the presence of the jury to consider the issue of spoliation of evidence, which the plaintiffs raised by a motion in limine seeking to preclude the defendants from offering evidence related to the discarded porch columns. Finding that Garfield had been negligent in the loss of the columns as evidence, and that the loss amounted to spoliation, the judge allowed the motion. The judge ruled that, as a consequence, the defendants would be precluded from presenting any evidence relating to the columns, that the plaintiffs would be permitted to inquire as to the unavailability of the columns, and that the jury would be instructed that they could draw an adverse inference because of the unavailability of the evidence.

The defendants argue that the judge erroneously shifted the burden of proof to them, that he erred in finding that the loss of the columns amounted to negligent spoliation, and that he abused his discretion in imposing sanctions therefor. The judge neither erred nor abused his discretion.

with special verdicts in similar circumstances. See *Young* v. *Garwacki*, 380 Mass. 162, 164 n.1 (1980) (judge instructed jury considering negligence claim by guest of tenant who fell from porch to find whether landlord owed implied duty of care in order to obviate need for new trial if appellate court were to decide on appeal of case that landlords owed such a duty). Here, the judge followed the practice by charging the jury as to both negligence and breach of the warranty of habitability and including special questions on both theories. However, the judge did not put the special questions to the jury in a proper sequence. It would have been better to ask the jury to determine first whether the landlord had breached the implied warranty of habitability, and then whether the landlord had been negligent and whether Scott had been comparatively negligent.

"The destruction of relevant evidence . . . has a pernicious effect on the truth-finding function of our courts." *Fletcher* v. *Dorchester Mut. Ins. Co.*, 437 Mass. 544, 553 (2002). The doctrine of spoliation permits the imposition of sanctions and remedies where a litigant or its expert negligently or intentionally loses or destroys evidence that the litigant (or expert) knows or reasonably should know might be relevant to a possible action, even when the spoliation occurs before an action has been commenced.[10] *Kippenhan* v. *Chaulk Servs., Inc.*, 428 Mass. 124, 127 (1998). Cf. *Wiedmann* v. *Bradford Group, Inc.*, 444 Mass. 698, 704-707 (2005) (no abuse of discretion in imposition of sanctions for spoliation where plaintiff prejudiced by failure of defendant former employer, despite notice and statutory duty, to maintain plaintiff's employment records); *Keene* v. *Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 227, 233-237 (2003) (doctrine of spoliation applicable where defendant hospital negligently lost or destroyed medical records essential to plaintiff's malpractice claim; defendant should have been aware of a likely claim at least as early as time that it filed notice of potential claim with insurer). "[O]nce a 'litigant or its expert knows or reasonably should know that the evidence might be relevant to a possible action,' we have imposed a duty to preserve such evidence in the interests of fairness." *Fletcher* v. *Dorchester Mut. Ins. Co.*, supra at 550, quoting *Kippenhan* v. *Chaulk Servs., Inc.*, supra. "The threat of a lawsuit must be sufficiently apparent, however, that a reasonable person in the spoliator's position would realize, at the time of spoliation, the possible importance of the evidence to the resolution of the potential dispute." *Kippenhan* v. *Chaulk Servs., Inc.*, supra.

"Massachusetts affords a greater range of remedies for spoliation than the majority of jurisdictions, which limit relief to

[10]To the extent that any discrepancy exists between the standard expressed in *Kippenhan* v. *Chaulk Servs., Inc.*, 428 Mass. 124, 127 (1998) ("if a litigant or its expert knows or reasonably should know that the evidence might be relevant to a possible action"), and *Keene* v. *Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 233-237 (2003) ("evidence known to be relevant"), we need not resolve it here because, as discussed *infra*, the judge properly found not only that Garfield reasonably should have known that the columns might be relevant to possible litigation, but also that he actually did appreciate the likely relevance of the columns to such litigation.

permitting an adverse inference against the responsible party."
*Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 488 (2003). We have
held that a judge may exclude evidence to remedy unfairness
caused by the destruction or alteration of evidence by a party to
litigation or by persons affiliated with a party. *Fletcher* v.
*Dorchester Mut. Ins. Co., supra*, and cases cited. "The spectrum
of remedies includes allowing the party who has been aggrieved
by the spoliation to present evidence about the preaccident
condition of the lost evidence and the circumstances surround-
ing the spoliation." *Gath* v. *M/A-Com, Inc., supra.*

Once the plaintiffs produced evidence sufficient to establish
certain preliminary facts, the judge did not abuse his discretion
in conducting an evidentiary hearing where the burden of proof
was on the defendants, who, as the alleged spoliators, were in a
better position to prove that there had been no fault in their
failure to preserve the columns as evidence. See *Nally* v. *Volks-
wagen of Am., Inc.*, 405 Mass. 191, 198-199 (1989). Nor was
there error in the judge's finding that the loss of the columns
amounted to negligent spoliation. There was no factual dispute
that Garfield, as the landlord, had been in control of the columns
after the accident, and that at the time when the columns were
discarded, Garfield knew that he would likely be involved in
litigation. In these circumstances, he should have also recognized
the logical connection between the columns and the railings such
that he reasonably should have appreciated the possible importance
of the columns as evidence in such litigation. On the basis of
these uncontested facts, Garfield had a duty to preserve the
columns. *Fletcher* v. *Dorchester Mut. Ins. Co., supra.* The judge
also correctly rejected the defendants' contention that Garfield
could not have been negligent in the loss of the columns where
Scott's attorney specifically requested that the railing be preserved
but made no comparable request as to the columns. The railing
was no longer attached to the porch and was on the ground,
which presumably was why Scott's counsel specifically requested
that it be retained. The columns, however, remained attached and
integral to the structure of the porch, and did not appear to be in
imminent danger of being discarded. Had the defendants provided
notice to the plaintiffs' counsel of their intention to repair the
porch, their counsel would have been in a position to make a

comparable request that the columns be preserved. The sanction imposed by the judge was proper, given the finding that spoliation occurred.

c. *Medical bills.* Just prior to trial, the judge denied a motion in limine made by the defendants that sought to limit the jury's consideration of Scott's medical bills to the amounts actually paid to his health care providers, rather than the amounts billed by those health care providers. At trial, the judge overruled the defendants' objection to the introduction in evidence of the medical bills with the amounts paid having been redacted, and denied a subsequent request by the defendants' counsel for a preliminary ruling that would have allowed the defendants to attack the credibility of Scott's testimony as to the amounts of medical expenses he had incurred. The defendants argue that the amounts actually paid to the health care providers toward the total amounts billed should not have been excluded from evidence, because such evidence, in addition to the total amounts of money billed by the providers, would have been relevant to the jury's determination of Scott's reasonable medical expenses.

"A plaintiff who has suffered physical injury through the fault of a defendant is entitled to recover for . . . reasonable expenses incurred by him for medical care and nursing in the treatment and cure of his injury . . . . The measure of damages is fair compensation for the injury sustained." *Rodgers* v. *Boynton*, 315 Mass. 279, 280 (1943). General Laws c. 233, § 79G, provides that bills for medical services "shall be admissible as evidence of the fair and reasonable charge for such services." Section 79G further provides that it does not, by its own provisions, limit the right of a party to summon a provider of medical services for the purpose of cross-examination with respect to the bill.

Moreover, under the "collateral source rule," we have held that a defendant may not show that a plaintiff has received other compensation for his injury from some other source. *Corsetti* v. *Stone Co.*, 396 Mass. 1, 16-17 (1985). "The rationale behind this so-called 'collateral source rule' is that the receipt of such income does not lawfully reduce the plaintiffs' damages, 'yet jurors might be led by the irrelevancy to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing

that otherwise there would be unjust double recovery.' " *Id.* at 17, quoting *Goldstein* v. *Gontarz*, 364 Mass. 800, 809 (1974).

Here, the judge properly excluded from the jury's consideration the amounts paid to Scott's health care providers. The collateral source rule required that the amounts actually paid to the health care providers by the health insurer be redacted on the medical bills admitted in evidence.[11] In any event, there could be no abuse of discretion here. Despite the defendants' argument that the jury, in determining Scott's reasonable medical expenses, should have been allowed to consider, in addition to the amounts billed, the amounts actually accepted by the health care providers as full payment, the defendants made no evidentiary proffer, i.e., a showing that the health care providers had agreed to accept as full payment some amount less than the amount billed, that would have laid the foundation for such a challenge to the application of the collateral source rule.

Nor was it error for the judge to instruct the jury that, "if the medical, hospital, rehabilitation, or physical therapy expenses were paid by a third party such as a medical insurance company or a health maintenance organization, that party can seek reimbursement from any amount paid from any judgment you may award." The judge's instruction correctly stated the law under the medical lien statute, G. L. c. 111, § 70A. Nothing about the judge's statement to the jury suggested that a third source had, in fact, paid Scott's medical bills or that a medical lien existed. When considered in the context of an earlier jury instruction that the judge gave during the trial, where, in response to a requested question submitted by a juror whether Scott had health insurance, the judge declined the request and instructed the jury not to consider the issue of insurance in their deliberations, the judge's instruction here was remedial in nature. The question from the juror made apparent that the issue whether Scott had health insurance had already entered into at least one juror's

---

[11]Although the jury still would not have been able to consider, in determining Scott's reasonable medical expenses, any difference between the amounts billed by his health care providers and the amounts accepted by those providers as full payment, the defendants nonetheless could have instead sought to challenge the reasonableness of the amounts billed (in and of themselves) by summoning Scott's medical providers for cross-examination with respect to the bills. G. L. c. 233, § 79G.

consideration during the trial, and the judge's instruction at that time, together with the statement that the defendants challenge here, adequately addressed the subject.

3. *Conclusion.* For the foregoing reasons, we affirm the judgment entered in this case.

*So ordered.*

CORDY, J. (concurring, with whom Botsford, J., joins). I agree with the court that a lawful visitor may recover for personal injury caused by the breach of the implied warranty of habitability, and that the judge did not err in his rulings on spoliation. I write separately only with respect to the judge's exclusion of evidence of the actual payments made on the plaintiff's medical bills.

Just prior to trial, the defendants filed a motion in limine asking the court to allow the jury to consider only the portion of the medical bills that were actually paid by the plaintiff's health care provider when determining his reasonable medical expenses. The motion was properly denied. See G. L. c. 233, § 79G (medical bills admissible as evidence of fair and reasonable charges). At trial, during the plaintiff's testimony, the defendants objected to the admission of copies of the plaintiff's medical bills from which the amounts paid to the hospital and doctors who treated the plaintiff had been redacted, arguing that the amounts actually paid were relevant to the plaintiff's "credibility" and to his actual damages.[1] The judge overruled the objection on the ground that any discounted benefits negotiated by the plaintiff's health care insurer were essentially a form of third-party benefit, evidence of which is barred by our collateral source rule.

The judge's rulings were based largely on the jurisprudence of other jurisdictions. Massachusetts appellate courts have not

[1] The plaintiff was insured by Tufts Health Plan, which had apparently negotiated discounted rates with the medical providers that provided care to the plaintiff, although there is nothing in the record that resolves this definitively. The amounts actually paid are also not clear from the record, and the unredacted bills were not marked for identification as part of an offer of proof. In his argument before the trial judge, defense counsel alluded to the amount billed "at a sum twice as great as" the amounts paid.

had occasion to decide whether evidence of a discount from the initial charges for medical services is barred by the collateral source rule, or whether the discounted amount paid and accepted in full satisfaction of those charges is relevant and admissible on the issue of the reasonable value of the medical services for which plaintiff is entitled to recover. Because the defendants did not make a sufficient offer of proof to preserve and present the issue in this case, see note 1, *supra,* I would hold that for future cases such evidence is not barred by the collateral source rule and may be admitted (together with the initial medical bills) for the jury's consideration of the reasonable medical expenses incurred by the plaintiff.

It has long been the law in Massachusetts that "[a] plaintiff who has suffered physical injury through the fault of a defendant is entitled to recover for . . . *reasonable* expenses incurred by him for medical care and nursing in the treatment and cure of his injury" (emphasis added). *Rodgers* v. *Boynton,* 315 Mass. 279, 280 (1943). Massachusetts also adheres to the collateral source rule with respect to damages. See *Goldstein* v. *Gontarz,* 364 Mass. 800, 808-809 (1974).

The collateral source rule has a substantive component and an evidentiary component. See *Leitinger* v. *DBart, Inc.,* 302 Wis. 2d 110, 149-150 (2007) ("collateral source rule began as a substantive rule of damages," but has since "taken on an evidentiary character"). The substantive component bars the reduction of the plaintiff's compensatory award by the amount of the benefits the plaintiff receives from third parties, "collateral sources" (typically insurance companies), as a consequence of his injuries. See *Corsetti* v. *Stone Co.,* 396 Mass. 1, 16-17 (1985). The evidentiary component ordinarily bars admission of evidence of the existence of the collateral source or the receipt of such benefits as irrelevant to the issue of damages, and liable to be misused by the jury. *Id.*

The issue presented in this case concerns a tension among the collateral source rule, the right of an injured plaintiff to recover only his *reasonable* medical expenses, and the right of a defendant to challenge those expenses when relying on medical bills that bear little relationship to the amount actually paid for the care received, irrespective of who made the payment.[2]

---

[2]In this era of increased insurance protection, the collateral source rule has

The issue is one of considerable controversy in both the courts and State Legislatures around the country.[3] A majority of the courts that have considered the issue have concluded "that plaintiffs are entitled to claim and recover the full amount of reasonable medical expenses charged, based on the reasonable value of medical services rendered, including amounts written off from the bills pursuant to contractual rate reductions." *Lopez* v. *Safeway Stores, Inc.*, 212 Ariz. 198, 206 (Ct. App. 2006). See *Wills* v. *Foster*, 229 Ill. 2d 393, 410 (2008) (citing cases from twelve jurisdictions supporting conclusion that "vast majority of courts to employ a reasonable-value approach hold that the plaintiff may seek to recover the amount originally billed by the medical provider").[4]

Some of these courts have concluded (as the judge did here) that any discount off of the charges submitted by a medical provider afforded to a plaintiff (or his health care insurer) is itself a form of benefit or compensation provided by a collateral source — either the medical provider or the insurer through its

"allowed plaintiffs to effectuate double and even triple recovery as a result of injuries received by them." *Eastin* v. *Broomfield*, 116 Ariz. 576, 583 (1977). Consequently, the rule and the validity of its rationales have been strongly criticized by commentators. See Anderson, The Collateral Source Rule and Medicaid Plaintiffs: Eliminating Windfalls and Double Recoveries, 30 T. Jefferson L. Rev. 223 (2007); 2 D.B. Dobbs, Remedies § 8.6(3), at 496 (2d ed. 1993); D.B. Dobbs, Torts § 380, at 1059 (2000). The continued viability of the rule is not before us in this case, and I am not suggesting that we amend it.

[3] As of 2005, twenty-one States had modified or abolished the collateral source rule. See *Robinson* v. *Bates*, 112 Ohio St. 3d 17, 22 (2006). Massachusetts itself has by statute modified the collateral source rule in medical malpractice actions. See G. L. c. 231, § 60G (allowing evidence of payments from collateral sources, except gratuitous payments, and requiring commensurate reduction of damages awarded to plaintiff).

[4] In contrast, other courts employing the reasonable value approach, have limited the injured plaintiff's recovery to the amount of the medical expenses actually paid. See *Hanif* v. *Housing Auth. of Yolo County*, 200 Cal. App. 3d 635, 639-643 (1988) (reasonable value is a "term of limitation, not of aggrandizement. . . . [W]hen the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care"). See also *Moorhead* v. *Crozer Chester Med. Ctr.*, 564 Pa. 156, 159-161 (2001) (Supreme Court of Pennsylvania concluded that plaintiff was only "entitled to the amount actually paid" by Medicare [$12,167] and not the additional amount billed [$96,500] by her medical providers for which she "never was and never will be legally obligated to pay").

discounted payment contract with the provider. See *id.*, and cases cited. Therefore, the argument is made, any discount essentially falls under the substantive component of the collateral source rule and, consistent with the purpose of that rule, cannot be used as a basis to reduce a defendant's liability to an injured plaintiff. To hold otherwise, these courts conclude, would permit the tortfeasor to reap the benefit of a contract for which the wrongdoer paid no compensation, see *Lopez* v. *Safeway Stores, Inc., supra*, and derogate the "tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." Restatement (Second) of Torts § 920A comment b (1979).

Other courts sharing the majority view have reasoned that the admission in evidence of the amounts actually paid to and accepted by the provider would essentially allow in through the back door what the defendant could not get in through the front — that is, that the bills have been paid by a collateral source, see *Leitinger* v. *DBart, Inc., supra* at 149-150, thus violating the evidentiary component of the rule. This, those courts contend, would lead to jury confusion, the potential misuse of the evidence, and the undermining of the collateral source rule. See, e.g., *Bennett* v. *Haley*, 132 Ga. App. 512, 523-524 (1974); *Arthur* v. *Catour*, 216 Ill. 2d 72, 98 (2005) (McMorrow, C.J., dissenting); *Covington* v. *George*, 359 S.C. 100, 104 (2004); *Leitinger* v. *DBart, Inc., supra.*

While a number of courts that have considered the question have ruled that the discounted amounts actually paid are not relevant to or admissible on the issue of the reasonableness of the medical expenses that the plaintiff can recover, there is an increasing number that disagree. I share the view expressed by the Supreme Court of Ohio in *Robinson* v. *Bates*, 112 Ohio St. 3d 17 (2006), and the Supreme Court of Indiana in *Stanley* v. *Walker*, 906 N.E.2d 852 (Ind. 2009). The Ohio court held that "[b]oth the original medical bill rendered and the amount accepted as full payment are admissible to prove the reasonableness and necessity of charges rendered for medical and hospital care." *Robinson* v. *Bates, supra* at 23. The court first held that "[t]he collateral-source rule does not apply to write-offs of expenses that are never paid." *Id.* at 22. Therefore, "admitting evidence of write-

offs does not violate the purpose behind the collateral-source rule." *Id.* at 23. It then reasoned that "[d]ue to the realities of today's insurance and reimbursement system, in any given case, the determination [of the reasonable value of medical treatment] is not necessarily the amount of the original bill or the amount paid.[5] Instead, [it] is a matter for the jury to determine from all relevant evidence." *Id.*

The Indiana court adopted a similar approach in *Stanley* v. *Walker, supra.* The court first noted that under its rules of evidence, "[s]tatements of charges" for medical expenses were admissible and constituted "prima facie evidence that the charges are reasonable." *Id.* at 856. The court went on to cite recent studies of hospital charge structures, operations and payments, concluding that "[c]urrently, the relationship between charges and costs is 'tenuous at best,' " and that the "complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services." *Id.* at 857. As a consequence, the court held that both the original bill and the amount accepted are evidence relevant to determining the reasonable value of medical expenses and are admissible as such. *Id.* at 858.[6]

The view expressed by these courts of last resort is not inconsistent with Massachusetts law on the subject of the proof of reasonable medical expenses in tort actions. General Laws c. 233, § 79G, provides in relevant part that itemized medical bills relating to care provided for an injured person "shall be admissible as evidence of the fair and reasonable charge for such services." It also provides, however, that the statute "shall

---

[5] See McGrath, Overcharging the Uninsured in Hospitals: Shifting a Greater Share of Uncompensated Medical Care Costs to the Federal Government, 26 Quinnipiac U. L. Rev. 173, 184-185 (2007) (over ninety per cent of payors for hospital services pay "significantly discounted rates." In California, Medicare pays twenty-seven per cent of the list prices; managed care providers pay a discount rate of about thirty-five per cent of the list prices).

[6] The Supreme Court of Indiana also agreed with the Ohio Supreme Court that the collateral source rule does not bar evidence of discounted amounts admitted for the purpose of establishing the reasonable value of medical services. See *Stanley* v. *Walker,* 906 N.E.2d 852, 858 (Ind. 2009). It did, however, suggest that the "adjustments or accepted charges" should be introduced "without referencing insurance." *Id.*

[not] be construed to limit the right of any party . . . to summon . . . the records of such hospital or health maintenance organization for the purpose of cross examination with respect to such bill[s] . . . or to rebut the contents thereof, or for any other purpose." Plainly, the statute does not bar the defendants from requiring the medical provider to produce records of the actual amount paid and accepted by the provider on its bills, for the purpose of questioning, cross-examining, or establishing the fair and reasonable value of the services described.

In sum, while I do not challenge the principal tenet of the collateral source rule, that benefits or payments received on behalf of a plaintiff from an independent source should not diminish recovery from the tortfeasor, the plaintiff is only entitled to the reasonable value of his medical expenses, and the price that a medical provider is prepared to accept for the medical services rendered is highly relevant to that determination.[7]

---

[7]The form in which such evidence might be admitted would depend on the facts of the case, e.g., responses to requests for admissions, a properly authenticated statement of account showing payment in full, or testimony from representatives of the medical providers.